Kenworth of Mobile, Inc., d/b/a Volvo Trucks of Mobile ("Kenworth"), appeals from an order of the Mobile Circuit Court denying its motion to compel arbitration. Volvo Group North America, Inc. ("Volvo Group"), and Volvo Trucks North America, Inc. ("Volvo Trucks"), appeal separately from an order of the trial court in the same action denying their motion to compel arbitration. We have consolidated the *Page 536 
appeals for the purpose of writing one opinion, and we reverse as to both appeals.
 I. Facts and Procedural History
Kenworth is a Volvo truck dealership located in Mobile. In 2001 and 2002, Dolphin Line, Inc. ("Dolphin"), purchased a number of Volvo trucks from Kenworth. In conjunction with those purchases, Dolphin allegedly entered into an agreement with Kenworth, Volvo Trucks, and Volvo Group whereby those parties agreed that Dolphin could trade back the trucks it purchased from Kenworth when making future purchases of Volvo trucks ("the trade-back agreement"). On April 10, 2006, Dolphin filed a complaint against Kenworth, Volvo Group, and Volvo Trucks, alleging the following details surrounding its purchase of the trucks from Kenworth:
 "7. In or around July of 2001, Dolphin entered negotiations with . . . [Kenworth], [Volvo Group], and/or [Volvo Trucks] to purchase five new Volvo trucks.
 "8. The negotiations involved the purchase of five model year 2001 Volvos.
 "9. At the time of negotiations, the five 2001 model year trucks were one model year old, as 2002 model year trucks were being produced and sold.
 "10. [Volvo Group] and/or [Volvo Trucks] and [Kenworth] had been unable to find a buyer for the five 2001 model year trucks.
 "11. Although the 2001 model year trucks were new, the release of the 2002 model year trucks significantly reduced the marketability of the 2001 model year trucks.
 "12. [Volvo Group], then acting under the name of [Volvo Trucks], by and through its Pricing Administration Manger [sic], Brian Layman, and [Kenworth], acting by and through its President, Bob Mitchell, and its salesman, Tom Mitchell, induced Dolphin to purchase the five 2001 model year trucks by offering a one for one tradeback on future Volvo truck purchases.
 "13. Dolphin entered negotiations with the local Volvo distributor, [Kenworth] and [Volvo Group] to purchase five new Volvo trucks.
 "14. [Volvo Group] and [Kenworth] contractually agreed to protect Dolphin at the end of Dolphin's trade cycle, by guaranteeing the values of the five trucks.
 "15. Dolphin entered other negotiations with [Kenworth] and [Volvo Group] for the purchase of additional trucks.
 "16. In 2002, only two months before the release of the 2003 model year trucks, [Kenworth] and [Volvo Group] persuaded Dolphin to purchase seventeen 2002 model year trucks, by again offering guaranteed values of trade.
 "17. Beyond needing to sell the aging model year trucks, [Volvo Group] and [Kenworth] were also interested in selling the proprietary Volvo engine, the VED 12, to Dolphin.
 "18. The VED 12 motor consistently brings much lower resale values to the Volvo trucks and is not a preferred motor in the trucking industry.
 "19. Nevertheless, [Volvo Group] and [Kenworth] guaranteed the repurchase of the trucks at specified values, inducing Dolphin to purchase the trucks with the VED 12 motor.
 "20. Each of the tradeback agreements allowed Dolphin to return the trucks to [Volvo Group] and [Kenworth] 36 or 48 months after the trucks were purchased.
 "21. In total, [Volvo Group] and [Kenworth] persuaded Dolphin to purchase 51 trucks, under a guaranteed *Page 537 
trade-back agreement, at the end of Dolphin's trade cycle.
 "22. In August 2003, Dolphin communicated verbally and in writing its desire to trade back, one for one, the first set of five (5) trucks to [Volvo Group] and [Kenworth].
 "23. This communication went unanswered.
 "24. In June 2004, Dolphin again communicated verbally and in writing its desire to trade back, one for one, the trucks under the trade back agreements.
 "25. Despite their written contract, [Volvo Group] and [Kenworth] ignored and refused Dolphin[']s request to trade the trucks."
Dolphin's complaint included four counts: (1) breach of contract; (2) fraudulent misrepresentation; (3) unjust enrichment; and (4) promissory estoppel.
As part of the purchases of the 51 trucks, Kenworth and Dolphin signed documents known as "Buyer's Orders," which listed the terms of the purchases. Among the terms included in the Buyer's Orders was an arbitration provision that stated:
 "ARBITRATION. Any controversy or claim arising out of or relating to this Buyer's Order or otherwise relating in any fashion to the purchase or sale of the equipment, and/or any other controversy or claim whatsoever arising between the parties hereto, shall be submitted to arbitration in Birmingham, Alabama, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Judgment upon any award rendered in such proceedings may be entered in any court having jurisdiction thereof, and the parties hereto submit to the jurisdiction of all State and Federal courts located in Birmingham, Alabama, for the purpose of entering said judgment. Furthermore, Buyer and Dealer acknowledge that this transaction involved interstate commerce, and Buyer warrants that the Equipment is to be used primarily for business, rather than family or household, purposes. Nothing in this agreement, and no exercise of any right of arbitration, will limit the right of any person, whether before, during or after the pendency of any arbitration proceeding, (a) to foreclose against any collateral by the exercise of any power of sale under any security agreement or other instrument or under applicable law, (b) to exercise self-help remedies such as setoff or repossession, or (c) to obtain provisional or ancillary remedies such as pre-judgment seizure of property."
Volvo Group and Volvo Trucks were not signatories to the Buyer's Orders.
On June 12, 2006, Kenworth filed a motion to stay the action and to compel Dolphin to arbitrate its claims against Kenworth. Kenworth argued that the arbitration provision in the Buyer's Orders covered Dolphin's claims and that the transactions at issue in the case involved interstate commerce. As a result, Kenworth argued, the Federal Arbitration Act, 9 U.S.C. § 1
et seq., required Dolphin to arbitrate its claims.
On June 20, 2006, Volvo Group and Volvo Trucks filed a motion to stay the action and to compel Dolphin to arbitrate its claims against them. They argued that they were entitled to seek enforcement of the arbitration provision contained in the Buyer's Orders because the language of the arbitration provision was not so restrictive as to preclude its enforcement by nonsignatories, because Dolphin's claims fell within the description in the arbitration provision of those claims subject to arbitration, and because Dolphin's claims against Volvo Group and Volvo Trucks were "intimately founded in and intertwined with" its claims against Kenworth. *Page 538 
On July 20, 2006, Dolphin responded to Kenworth's motion. It argued that the Buyer's Orders were not applicable to the present case because, it argued, the complaint "unambiguously dictate[d] that the nature of this action [did] not lie with the purchase of the trucks, but with the Defendants['] failure to repurchase the trucks at the end of their trade cycle." According to Dolphin, "there [was] no dispute in connection with the purchase of the trucks." Dolphin also asserted that the trade-back agreement, which was the basis of the case, did not require the parties to arbitrate their claims.
Dolphin attached to its response a series of documents that it stated constituted the trade-back agreement. One of the documents was entitled "Used Truck Trade Agreement" and was signed by a representative of Volvo Trucks. Another document contained within the trade-back agreement contained a provision that stated: "The attached `Used Truck Trade Agreement' and the `Trade Vehicle Specification Outline' are the only documents that will govern the details of any trade transaction and must be signed by all parties to the agreement in order to be considered an agreement." Kenworth moved to strike this attachment because, it said, it was not properly authenticated and was therefore inadmissible.
On July 28, 2006, the trial court denied Kenworth's motion to compel arbitration. Kenworth appealed the trial court's order to this Court.
On August 8, 2006, Dolphin responded to Volvo Group and Volvo Trucks' motion to compel arbitration. It repeated the argument it had made in opposition to Kenworth's motion to compel arbitration, and, in addition, pointed out the language contained in the series of documents it had submitted in opposition to Kenworth's motion indicating that the "`Used Truck Trade Agreement' and the `Trade Vehicle Specification Outline' are the only documents that will govern the details of any trade transaction. . . ." Dolphin attached this series of documents, as well as the affidavit of its president authenticating the documents, to its response.
On August 15, 2006, the trial court denied Volvo Group's and Volvo Trucks' motion to compel arbitration. Volvo Group and Volvo Trucks appealed to this Court. We consolidated Kenworth's appeal with Volvo Group and Volvo Trucks' appeal.
 II. Standard of Review
In Fleetwood Enterprises, Inc. v. Bruno, 784 So.2d 277
(Ala. 2000), we discussed the standard of review applicable to an appeal of the denial of a motion to compel arbitration:
 "This Court reviews de novo the denial of a motion to compel arbitration. Parkway Dodge, Inc. v. Yarbrough, 779 So.2d 1205 (Ala. 2000). A motion to compel arbitration is analogous to a motion for a summary judgment. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala. 1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction affecting interstate commerce. Id. `[A]fter a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.' Jim Burke Automotive, Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala. 1995) (opinion on application for rehearing)."
784 So.2d at 280 (emphasis omitted). We note that the proper method by which to challenge the denial of a motion to compel arbitration is by appeal. Rule 4(d), *Page 539 
Ala. R.App. P.; AmSouth Bank v. Dees, 847 So.2d 923,928 (Ala. 2002).
III. Kenworth's Appeal (no. 1051643)
Kenworth contends that the trial court erred when it denied its motion to stay the action and to compel arbitration. It argues that the arbitration agreement contained in the Buyer's Orders covers the dispute in this case and requires the arbitration of Dolphin's claims against it.
In the trial court, Kenworth submitted the Buyer's Orders, signed by a representative of Dolphin, that set forth the terms of the agreements by which Kenworth sold Dolphin the trucks at issue in this case. As noted, the Buyer's Orders contained an arbitration agreement. Kenworth also submitted undisputed evidence to the trial court that the Buyer's Orders evidenced a transaction affecting interstate commerce. The issue before the trial court, then, was whether the arbitration agreement applied to the dispute. See Fleetwood Enters., Inc.,784 So.2d at 280.
The arbitration agreement contained in the Buyer's Orders provides, among other things, that "[a]ny controversy or claim arising out of or relating to this Buyer's Order or otherwise relating in any fashion to the purchase or sale" of the trucks "shall be submitted to arbitration." Kenworth argues that this language is sufficiently broad to encompass Dolphin's claims against it. Dolphin responds that its claims arise solely from the trade-back agreement, not from the Buyer's Orders, and that the trade-back agreement does not contain an arbitration provision. It points out that the trade-back agreement contains a clause providing that the "`Used Truck Trade Agreement' and the `Trade Vehicle Specification Outline' are the only documents that . . . govern[ed] the details of any trade transaction," thereby excluding the provisions of the Buyer's Orders from the dispute at issue. Dolphin also asserts that the Buyer's Orders each contain a merger clause that separates those agreements from the trade-back agreement and renders the arbitration provisions contained therein inapplicable to the trade-back agreement.
Dolphin's claims are based upon agreements and representations made in connection with its purchase of the trucks. Its averments make clear that the trade-back agreement was inextricably intertwined with Dolphin's purchase of the trucks when it asserts that the defendants induced it to purchase the trucks by offering the trade-back agreement and that, when purchasing the trucks, it relied on the defendants' representations regarding the trade-back agreement. Indeed, in its complaint, Dolphin clearly indicated that the defendants persuaded it to purchase the trucks (and thus to enter into the Buyer's Orders) by offering it the trade-back agreement.
We conclude that the dispute between Dolphin and Kenworth "relate[s] to [the] Buyer's Orders" and, in particular, "relate[s] . . . to the purchase or sale" of the trucks.See Serra Chevrolet, Inc. v. Hock, 891 So.2d 844, 847
(Ala. 2004) ("This Court has repeatedly stated `"that the words `relating to' in the arbitration context are given a broad construction."'"). Therefore, the dispute between Dolphin and Kenworth falls within the scope of the arbitration agreement contained in the Buyer's Orders.
Dolphin asserts that language in the trade-back agreement provides that the "`Used Truck Trade Agreement' and the `Trade Vehicle Specification Outline' are the only documents that . . . govern the details of any trade transaction." That does not exclude the application of other contracts not concerned with "the details of any trade transaction," nor does it prevent *Page 540 
other contracts between the parties, such as the Buyer's Orders, from determining in what forum a dispute as to "the details of any trade transaction" are to be resolved.
As noted, Dolphin argues that the merger clause in the Buyer's Orders prevents its application to the present case. That clause provides that, in signing the Buyer's Orders, Dolphin acknowledged that the terms contained therein "constitute[d] the entire agreement between [it] and [Kenworth], except for any other written agreement." The merger clause plainly recognizes that the parties to the Buyer's Orders may be entering into other written contracts that, as between the parties, would be binding. Nothing in the merger clause prevents the terms of the Buyer's Orders from applying to the present dispute, especially given that the trade-back agreement was allegedly of such a nature as to be integral to Dolphin's purchase of the trucks.[1] Indeed, it is Kenworth's position in this case that is bolstered by the fact that the Buyer's Orders contemplate "other written agreements" between the parties relating to the purchase or sale of the trucks and yet expressly provide that the requirement to arbitrate applies to "any controversy or claim . . . relating to this Buyer's Order or otherwise relating in any fashion to the purchase or sale of the equipment."
Dolphin relies on this Court's decision in CapitolChevrolet Imports, Inc. v. Payne, 876 So.2d 1106
(Ala. 2003). In that case, the plaintiff purchased a car from a dealership, signing a sales contract that included an arbitration agreement. After a month, she returned the car to the dealership "in reliance on [the dealership's salesperson]'s representation that [the dealership] had a willing buyer for the vehicle." 876 So.2d at 1107. The plaintiff alleged that the salesperson's representation to her that the dealership had a willing buyer for the car was a misrepresentation, and that, following her return of the car, the salesperson converted the car to his own use. The plaintiff sued the dealership and the salesperson, alleging that, "as a result of the misrepresentation, she lost the use of her vehicle, suffered severe mental anguish, and suffered an adverse credit rating once she stopped making payments on the [car]."876 So.2d at 1108.
The dealership moved to compel arbitration on the basis of the arbitration agreement contained in the sales contract. The trial court denied the dealership's motion, and the dealership appealed. Examining the language of the arbitration agreement at issue, this Court stated that "a fair reading of the arbitration agreement . . . leads to the conclusion that the agreement covers only disputes that more closely relate to the initial purchase and financing of the [car], and the negotiations and sale of other services incident to the initial sale of the [car]." 876 So.2d at 1109 (emphasis omitted). Concluding that the arbitration agreement did not cover the dispute at issue, we stated:
 "We do not believe that the plain language of the arbitration agreement would lead one to assume or understand that the agreement covered the claims alleged in Payne's complaint — a later *Page 541 
fraudulent misrepresentation, unrelated to the original sale of the vehicle, resulting in the conversion of the vehicle. The present dispute involves alleged subsequent tortious conduct on the part of Capitol and its agent that is not close enough in relation to the initial sale of the [car] to be covered by the language of the arbitration agreement."
876 So.2d at 1110. Thus, we affirmed the trial court's order denying the dealership's motion to compel arbitration.
Payne is distinguishable from the present case. Unlike the dispute in Payne, the dispute in the present case involves contractual undertakings that, if Dolphin's allegations are proven correct, are integral to the original purchase and sale of trucks at issue. Although the dispute inPayne "involve[d] alleged subsequent tortious conduct on the part of [the dealership] and its agent that [was] not close enough in relation to the initial sale of the [car] to be covered by the language of the arbitration agreement,"876 So.2d at 1110, the dispute in the present case relates directly to Dolphin's purchase of the trucks at issue, as well as the negotiations surrounding those purchases. Indeed, according to Dolphin's complaint, Dolphin would never have entered into the Buyer's Orders containing the arbitration provision but for the alleged fraud over which it is suing the defendants relating to the trade-back agreement. Although there was no nexus between the sales agreement and the alleged misrepresentation inPayne, Dolphin's allegations in its complaint clearly demonstrate the nexus between its agreement to buy the trucks from Kenworth and the trade-back agreement. Thus, Dolphin's reliance on Payne is misplaced.
Because the arbitration clause in the Buyer's Orders covers the dispute between Kenworth and Dolphin, we conclude that the trial court erred when it denied Kenworth's motion to stay the action and to compel arbitration.[2]
 IV. Volvo Group and Volvo Trucks' Appeal(no. 1051724.)
In their appeal, Volvo Group and Volvo Trucks contend that the trial court erred when it denied their motion to stay the action and to compel Dolphin to arbitrate its claims against them. They argue that, although they were not parties to the Buyer's Orders, which contain the arbitration agreement, the arbitration agreement applies to Dolphin's claims against them because, they argue, it is broad enough to encompass Dolphin's claims, the claims against them are "intimately founded in or intertwined with" Dolphin's claims against Kenworth, and the language of the arbitration agreement does not restrict its application to only disputes arising between Dolphin and Kenworth. Dolphin responds that Volvo Group and Volvo Trucks lack standing to enforce the arbitration agreement because the language of the arbitration agreement indicates that it applies to only those disputes arising between Dolphin and Kenworth.[3]
In Ex parte Stamey, 776 So.2d 85 (Ala. 2000), this Court discussed the issue whether and to what extent a defendant that is not a party to an arbitration provision can appropriately seek to compel the plaintiff to arbitrate its claims against the defendant:
 "Normally, in order to have a valid arbitration provision, there must be an *Page 542 
agreement to arbitrate, and if no agreement exists, then a party cannot be forced to submit a dispute to arbitration. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). The question whether one has assented to an arbitration provision is governed by ordinary principles of a state's common law and statutory law governing the formation of contracts. See Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ., 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). Assent to arbitrate is usually to be manifested through a party's signature on the contract containing the arbitration provision. However, both Federal courts and Alabama courts have enforced exceptions to this rule, so as to allow a nonsignatory, and even one who is not a party, as to a particular contract, to enforce an arbitration provision within that same contract. Two such exceptions apply to the present case. The first is an exception under a theory of equitable estoppel for claims that are so `intimately founded in and intertwined with' the claims made against a party that is a signatory to the contract. See Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993) (quoting McBro Planning Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342, 344 (11th Cir. 1984)); see also Ex parte Napier, 723 So.2d 49 (Ala. 1998); Ex parte Gates, 675 So.2d 371(Ala. 1996). . . .
 ". . . .
 "In order for a party to be equitably estopped from asserting that an arbitration agreement cannot be enforced by a nonparty, the arbitration provision itself must indicate that the party resisting arbitration has assented to the submission of claims against nonparties — claims that would otherwise fall within the scope of the arbitration provision — to arbitration. See Ex parte Napier, 723 So.2d at 53. All that is required is (1) that the scope of the arbitration agreement signed by the party resisting arbitration be broad enough to encompass those claims made by that party against nonsignatories, or that those claims be `intimately founded in and intertwined with' the claims made by the party resisting arbitration against an entity that is a party to the contract, and (2) that the description of the parties subject to the arbitration agreement not be so restrictive as to preclude arbitration by the party seeking it. See id. In other words, the language of the arbitration agreement must be so broad that the nonparty could assert that in reliance on that language he believed he had the right to have the claims against him submitted to arbitration, and, therefore, that he saw no need to enter into a second arbitration agreement."
 776 So.2d at 88-89 (emphasis, other than emphasis on second "and," added). See also Edwards v. Costner, 979 So.2d 757, 764 (Ala. 2007) ("Intertwining is `where nonarbitrable claims are considered so intimately founded in and closely related to claims that are subject to the arbitration agreement that the party opposing arbitration is equitably estopped to deny the arbitrability of the related claims.'" (quoting Ex parte Tony's Towing, Inc., 825 So.2d 96, 97 (Ala. 2002))); SouthTrust Bank v. Ford, 835 So.2d 990, 994-95 (Ala. 2002) ("The doctrine of intertwining is applicable where arbitrable and nonarbitrable claims are so closely related that the party to a controversy subject to arbitration is equitably estopped from denying the arbitrability of the related claim.").
Volvo Trucks and Volvo Group contend that they satisfy the first prong of the test in Stamey because, they say, Dolphin's claims against them are "intimately *Page 543 
founded in and intertwined with" its claims against Kenworth, which is a party to the arbitration agreement. This is so, they argue, because Dolphin's complaint "asserts the same causes of action against both Kenworth and [them] for the same alleged conduct, and arising out of the same transaction." We agree.
In Service Corp. International v. Fulmer,883 So.2d 621 (Ala. 2003), Blair Fulmer entered into a contract with SCI Alabama Funeral Services, Inc. ("SCI-Alabama"), for the provision of funeral and cremation services for his deceased mother. The contract included an arbitration provision. After Fulmer was given a vase that was supposed to have contained his mother's remains but allegedly did not, Fulmer sued SCI-Alabama and Service Corporation International ("SCI"), SCI-Alabama's parent corporation. The defendants filed a motion to compel arbitration, which the trial court denied. The defendants appealed.
SCI argued that, even though it was not a signatory to the contract containing the arbitration agreement, "Fulmer's claims against the signatory defendant, SCI-Alabama, are so `intertwined' with his claims against SCI that arbitration of all of Fulmer's claims, including those against SCI, is appropriate." 883 So.2d at 634. After noting Stamey's two-part test, this Court addressed the first part, which relates to whether the claims against the nonsignatory defendant are intertwined with the claims against the signatory defendant.
Finding that prong satisfied, this Court wrote:
 "Here, Fulmer's claims against SCI are clearly `intimately founded in and inter-twined with' his claims against SCI-Alabama. . . . All of Fulmer's claims arise from the same set of facts. Virtually none of Fulmer's claims makes a distinction between the alleged bad acts of SCI (the parent corporation) and those of SCI-Alabama (its subsidiary); rather, the claims are asserted as if SCI and SCI-Alabama acted in concert."
883 So.2d at 634.[4]
In the present case, Dolphin's claims against Volvo Group and Volvo Trucks arise from the same set of facts as do its claims against Kenworth. None of Dolphin's claims makes a distinction between any of the defendants. Instead, as in Fulmer, the claims are asserted against all the defendants as if they had acted in concert. As a result, we conclude that Dolphin's claims against Volvo Group and Volvo Trucks are "intimately founded in and intertwined with" its claims against Kenworth.[5]
Having concluded that the first prong of the Stamey
test is met, we proceed now to examine the second prong of that test, that is, whether "the description of the parties subject to the arbitration agreement [is] not . . . so restrictive as to preclude arbitration by" Volvo Group and Volvo Trucks. As previously noted, the arbitration provision *Page 544 
in the Buyer's Orders stated, in pertinent part:
 "Any controversy or claim arising out of or relating to this Buyer's Order or otherwise relating in any fashion to the purchase or sale of the equipment, and/or any other controversy or claim whatsoever arising between the parties hereto, shall be submitted to arbitration in Birmingham, Alabama, in accordance with the Commercial Arbitration Rules of the American Arbitration Association."
Dolphin argues that the phrase "arising between the parties hereto" modifies the phrase "controversy or claim" both times the latter phrase appears, thus limiting the application of the arbitration clause to only those disputes arising between it and Kenworth. Volvo Group and Volvo Trucks contend that the phrase "arising between the parties hereto" modifies the phrase "controversy or claim" only the second time it appears, so that the scope of the arbitration clause is not explicitly limited to disputes between Kenworth and Dolphin when the dispute is one "arising out of or relating to [the] Buyer's Order or otherwise relating in any fashion to the purchase or sale" of the trucks. We agree with Volvo Group and Volvo Trucks.
We first note that the clause "[a]ny controversy or claim arising out of or relating to this Buyer's Order or otherwise relating in any fashion to the purchase or sale of the equipment" stands alone syntactically. The following clause, in which is found the phrase "between the parties hereto," is set off from the former clause and the remainder of the sentence by commas and the introductory term "and/or." Accordingly, that phrase is not properly viewed as modifying the subject of the preceding clause.
We also note that if, as Dolphin asserts, the phrase "arising between the parties" modifies "controversy or claim" in both places it appears in the arbitration provision, the result would be that all claims between the parties to the contract (Dolphin and Kenworth), and no others, would be subject to arbitration. Were this the parties' intention, there would have been no reason to separately enumerate "claims or controversies arising out of or relating to this Buyer's Order or otherwise relating in any fashion to the purchase or sale of the equipment" from "any other controversy or claim whatsoever." Instead, were Dolphin's interpretation correct, the arbitration clause would more simply have stated that any claim or controversy arising between the parties to the Buyer's Order is subject to arbitration.[6]
Accordingly, we conclude that the proper interpretation of the arbitration clause is the one advanced by Volvo Group and Volvo Trucks, i.e., that the phrase "arising between the parties hereto" modifies only the latter category of claims or controversies contained within the clause, or "any other controversy or claim whatsoever." The phrase does not modify the former category of claims or controversies contained within the clause, i.e., those arising out of or relating to the Buyer's Orders or otherwise relating to the purchase and sale of the trucks.
Our conclusion is bolstered by the "strong presumption in favor of arbitration" *Page 545 
created by the Federal Arbitration Act. See, generally,Blue Cross Blue Shield of Alabama v. Rigas,923 So.2d 1077, 1083 (Ala. 2005). "In interpreting an arbitration provision, `any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'" The Dunes of GP, L.L.C. v. Bradford,966 So.2d 924, 927 (Ala. 2007) (quoting Moses H. Cone Mem'lHosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25,103 S.Ct. 927, 74 L.Ed.2d 765 (1983)) (emphasis omitted). Indeed, "`a motion to compel arbitration should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."'" Id. (quoting Ex parteColquitt, 808 So.2d 1018, 1024 (Ala. 2001), quoting in turn United Steelworkers of America v. Warrior GulfNavigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347,4 L.Ed.2d 1409 (1960)) (emphasis omitted). "While, `as with any other contract, the parties' intentions control, . . . those intentions are generously construed as to issues of arbitrability.'" Carroll v. W.L. Petrey Wholesale Co.,941 So.2d 234, 237 (Ala. 2006) (quoting Mitsubishi MotorsCorp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626,105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).
Because we find that the application of the arbitration clause is not limited, with regard to disputes that relate "in any fashion to the purchase or sale" of the trucks, to only those disputes arising between Kenworth and Dolphin, we conclude that the second prong of the test set forth in Stamey is met. In other words, we conclude that the description of the parties subject to the applicable portion of the arbitration clause is not so restrictive as to preclude arbitration of the claims against Volvo Group and Volvo Trucks.
Both prongs of the test set forth in Stamey having been met in this case, we hold that Dolphin is equitably estopped from asserting that the arbitration clause cannot be enforced by Volvo Group and Volvo Trucks. Thus, we conclude that the trial court erred when it denied their motion to stay the action and to compel arbitration.
 V. Conclusion
Based on the foregoing, we reverse the trial court's orders denying the motions to stay and to compel arbitration, and we remand the cause for the entry of an order staying the action and compelling Dolphin to arbitrate its claims against Kenworth, Volvo Group, and Volvo Trucks.
1051643 — REVERSED AND REMANDED WITH INSTRUCTIONS.
1051724 — REVERSED AND REMANDED WITH INSTRUCTIONS.
COBB, C.J., and LYONS, STUART, and BOLIN, JJ., concur.
[1] Dolphin further contends that the Buyer's Orders and the trade-back agreement are "disconnected in time," which, according to Dolphin, indicates that the agreements do not have a common nexus. However, the allegations of Dolphin's complaint clearly demonstrate that the agreements have a common nexus. According to the complaint, Dolphin purchased the trucks at issue (thus entering into the Buyer's Orders) based on the defendants' representations related to the trade-back agreement. That the parties did not sign the agreements at the same time is of no consequence for present purposes.
[2] Because we resolve Kenworth's appeal in this manner, we do not address its additional arguments supporting reversal of the order denying its motion to compel arbitration.
[3] Dolphin also responds with the arguments it asserted against Kenworth. As discussed in our treatment of Kenworth's appeal, those arguments are without merit.
[4] This Court went on to conclude that SCI could not enforce the arbitration agreement against Fulmer because, in spite of the fact that it met the first prong of Stamey, it did not meet the second prong of Stamey. In other words, the language of the arbitration agreement explicitly limited its application to Fulmer and SCI-Alabama.
[5] Because we find that Dolphin's claims against Volvo Group and Volvo Trucks are intimately founded in and intertwined with" its claims against Kenworth, we do not address Volvo Group and Volvo Trucks' argument that the first prong of the test in Stamey is met because "the scope of the arbitration agreement signed by the party resisting arbitration [is] broad enough to encompass those claims made by that party against nonsignatories."
[6] Dolphin also points to the merger clause on the face of the Buyer's Orders indicating that, by signing the Buyer's Orders, Dolphin was acknowledging that the terms of the Buyer's Orders (which included the arbitration clause) constituted the entire agreement between it and Kenworth, except for any other written agreements between them. The effect of this provision was to make inapplicable any other agreements between the parties that were not in writing. It did not have the effect, as argued by Dolphin, of excluding Volvo Group and Volvo Trucks from the arbitration clause.